**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**George William SANDERSON,**
**Defendant–Appellant.**

**No. 91–5564.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 11, 1992.

Decided May 21, 1992.

---

William Cohen, Asst. U.S. Atty. (argued and briefed), Ernest W. Williams, U.S. Atty., Office of the U.S. Atty., Nashville, Tenn., for plaintiff-appellee.

Charles R. Ray (argued and briefed), Bryan & Marett, Nashville, Tenn., for defendant-appellant.

Before: KEITH and MARTIN, Circuit Judges; and BELL, District Judge.[*]

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

BOYCE F. MARTIN, JR., Circuit Judge.

George Sanderson appeals his conviction for violation of a federal statute that makes criminal certain actions by local government employers receiving federal funds. On appeal, Sanderson argues that 1) the jury's verdict on the theft count was inconsistent with the jury's not-guilty verdict on an extortion count, 2) Sanderson was denied his right to a unanimous verdict on the theft count because the government propounded multiple theories of guilt, and 3) the district court erroneously ruled that the government could impeach Sanderson with evidence that the district court had earlier excluded from the government's case-in-chief. We affirm the district court on all grounds.

Sanderson was a supervisor in the Metropolitan Nashville–Davidson County Sheriff's Department. Sanderson also owned and operated his own private contracting business. On October 18, 1990, Sanderson was indicted for violating 1) 18 U.S.C. § 666(a)(1)(A) (West Supp.1991), which prohibits the theft of property, valued at $5,000 or more, from a local government agency that maintains a contract with the federal government, and 2) 18 U.S.C. §§ 1951(b)(2) and (3) (West Supp.1991), which prohibits extortion.

In the first count of the indictment, Sanderson was charged with stealing from the Sheriff's Department more than $5,000 worth of materials and more than $5,000 worth of employee time. In its argument to the jury the United States stated that the jury could convict Sanderson if it found he had committed either form of theft. The proof supporting this theory was that: 1) the Department paid bills to DeVoe Paint Company for supplies Sanderson used on his private projects; 2) the Department purchased substantially more DeVoe supplies during the period in question than at any other time; 3) employees of Sanderson, while on duty, worked substantial hours on Sanderson's private construction projects; 4) Sanderson paid these employees little or nothing for this un-official work; and 5) two employees testified that they never requested their compensatory

time be used to cover the official-duty hours they spent working on Sanderson's private contracts.

The second count of the indictment addressed specifically Sanderson's improper utilization of two Department employees on Sanderson's private construction projects. The government argued that Sanderson extorted the services of the two employees by playing on the two men's natural fear that they would lose their jobs if they refused to do as Sanderson ordered.

During trial, Sanderson sought a ruling out of the jury's presence as to whether the United States would be allowed to cross-examine him concerning air-conditioners he had allegedly stolen, should Sanderson choose to testify. The court ruled that the government could use this evidence to impeach Sanderson, even though such evidence was not admissible as part of the government's direct case. After this ruling, Sanderson chose not to testify in his own behalf.

At the conclusion of the government's case, Sanderson's counsel moved for acquittal, arguing that by submitting "multiple theories" of Sanderson's alleged criminal conduct to the jury, the government had been relieved of a key element of proof under the theft count of the indictment. The court rejected Sanderson's motion for acquittal and the jury convicted Sanderson on the theft count but not the extortion count. The court sentenced Sanderson to eighteen months imprisonment and ordered him to pay restitution to the Sheriff's Department in the amount of $9,307.

■ Sanderson argues that because the jury acquitted him of extortion, there was an inconsistency and thus the jury must have presumptively found that the value of the two employees' services could not have been the basis for a conviction under the theft count. This argument defies logic. Simply because the jury refused to convict Sanderson on the extortion count does not require an acquittal under the theft count. Sanderson claimed the employees who worked on his private contracts were using their compensatory time to do so. The jury, however, rejected Sanderson's version

of events and chose instead to believe the two employees' testimony that they did not ask to use their compensatory time to work on Sanderson's private projects. The jury's determination that Sanderson was guilty of theft under 18 U.S.C. § 666(a)(1)(A) is analytically distinct from its determination that he was not guilty of extorting the services of his employees under 18 U.S.C. § 1951. Because we find the verdicts to be consistent, we reject this argument.

Section 666(a)(1)(A) permits prosecution of any agent of a local government organization who "embezzles, steals, obtains by fraud or otherwise without authority knowingly converts ... property" valued at $5,000 or more, which is under the government's ownership or control. Sanderson argues that the government offered two conceptually distinct theories for conviction under this statute—theft of government supplies and theft of employee time—thus creating the risk of a composite verdict from the jury. The court did not give a specific unanimity instruction on this matter. Thus, Sanderson argues, we should reverse his conviction because it cannot be determined whether the jury convicted him for stealing the paint supplies or stealing the employee's time. The responsive argument is that both the stolen supplies and the stolen employee time represent, not distinct acts, but distinct proof of the same criminal act. Central to this dispute is whether a conviction for "theft of property" under section 666(a)(1)(A) is intended to encompass both theft of material supplies and theft of employee services and thus are a single course of criminal conduct.

■ Ordinarily it is not necessary to give specific unanimity instructions unless 1) a count is extremely complex, 2) there is variance between the indictment and the proof at trial, or 3) there is a tangible risk of jury confusion. *United States v. Duncan,* 850 F.2d 1104, 1114 (6th Cir.1988). Where a defendant fails to object to the jury instructions at trial, we review for plain error only. *United States v. Piccolo,* 723 F.2d 1234, 1241 (6th Cir.1983). Here Sanderson failed to object to the jury in-

structions at trial; thus, we review for plain error. We consider whether the instructions, when taken as a whole, were so clearly wrong as to produce a grave miscarriage of justice. *Id.* "[A]n omitted or incomplete instruction is even less likely to justify reversal, since such an instruction is not as prejudicial as a misstatement of the law." *United States v. Hook,* 781 F.2d 1166, 1172–73 (6th Cir.1986).

■ Until now, we have followed the unanimity analysis in *United States v. Gipson,* 553 F.2d 453 (5th Cir.1977). *See also Duncan,* 850 F.2d at 1110; *United States v. Bouquett,* 820 F.2d 165, 169 (6th Cir. 1987); *United States v. McPherson,* 782 F.2d 66 (6th Cir.1986). That analysis, however, has been rejected in *Schad v. Arizona,* —— U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

The Court in *Schad* began its analysis by recognizing the long-established rule that a jury need not agree on which overt act, among several, was the means by which a crime was committed. *Id.* 111 S.Ct. at 2496. This was a review of an Arizona state court's decision that upheld a defendant's first-degree murder conviction and death sentence, when the defendant was prosecuted on alternative theories of premeditated murder and felony-murder. In *Schad,* the Court focused on the limits placed on a state's capacity to define different states of mind as alternative means of committing a single offense. *Id.* The Court found that, in some cases, the differences between the means of committing a crime become so important that they may no longer be viewed as alternatives to a common end. *Id.* at 2497–98. The Court acknowledged the difficulty of formulating a comprehensive yet workable test in this area; nonetheless, the Court disavowed the "distinct conceptual groupings" standard espoused in *Gipson,* 553 F.2d at 453. *Schad,* 111 S.Ct. at 2499 ("the notion of 'distinct conceptual groupings' is simply too conclusory to serve as a real test"). The *Gipson* approach was flawed, the Court found, "because conjectural groupings may be identified at various levels of generality, and we have no *a priori* stan-

dard to determine what level of generality is appropriate." *Schad,* 111 S.Ct. at 2499.

In trying to formulate an answer to this conceptually difficult problem, the Court stated, at 111 S.Ct. at 2500:

> [O]ur sense of appropriate specificity is a distillate of the concept of due process with its demands for fundamental fairness, see, *e.g., Dowling v. United States,* 493 U.S. 342, 352–353, 107 L.Ed.2d 708, 110 S.Ct. 668 [674–675] (1990), and for the rationality that is an essential component of that fairness. In translating these demands for fairness and rationality into concrete judgments about the adequacy of legislative determinations, we look both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the mens rea element of a single offense. The enquiry is undertaken with a threshold presumption of legislative competence to determine the appropriate relationship between means and ends in defining the elements of a crime.

Even though this rule speaks in terms of a mens rea analysis, it rejects the *Gipson* model for analyzing unanimity problems. Thus the *Schad* rule should apply equally to analysis of multiple act reus elements as well as analysis of multiple mens rea elements. *Id.* at 2496–2500. Simply put, we interpret *Schad* to hold that there must be a common-sense determination of a subject statute's application and purpose in light of traditional notions of due process and fundamental fairness.

■ We do not find fundamental fairness principles are offended by Sanderson's conviction under section 666. We look first to the intent of the statute. Admittedly, determining what facts are necessary to constitute a criminal act is a "value choice more appropriately made in the first instance by a legislature rather than by a court." *Schad,* 111 S.Ct. at 2500. The

express terms of the section, however, provide no clues as to what forms of stolen "property" are prohibited by the statute. We look next at the legislative history of the statute, which unfortunately, is scant.[1] What little can be gleaned from the section's general legislative history is that the section was

> designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies which are disbursed to private organizations or State and local governments pursuant to a Federal program.

S.Rep. No. 225, at 369, 98th Cong., 2d Sess., reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3510. Thus it seems Congress intended this statute to augment the prosecutorial powers of 18 U.S.C. §§ 641 and 665. *Id. See also United States v. Cicco,* 938 F.2d 441, 444–45 (3d Cir.1991). Section 665, which prohibits theft from an agency receiving assistance under the Job Training Partnership Act, limits prosecution only to those instances where the criminal conduct occurred in relation to that statute. Application of section 641, which prohibits thefts of a wide variety of federal property, is restricted to instances where the property stolen can be shown to be property of the United States. Very often then, prosecution under section 641 "is impossible because title has passed to the recipient before the property is stolen, or the funds are so commingled that the Federal character of the funds cannot be shown." 1984 U.S.Code Cong. & Admin.News at 3510.

Thus it seems that Congress intended section 666 to augment the general theft statute of section 641. Accordingly, we look at section 641 and its applicability to prosecutions for multiple actus reus elements. By its literal terms, section 641's notion of property is broader than section 666. Section 641 provides for prosecution of any one who "knowingly converts ... any ... *thing of value.*" We have previ-

---

1. The bulk of legislative history available relates to 18 U.S.C. § 666(a)(1)(B), which concerns bribery, not to sub-section 666(a)(1)(A).

ously found that the theft prohibition in section 641 applies where both intangible and tangible property has been stolen. *Burnett v. United States*, 222 F.2d 426, 427 (6th Cir.1955) (wrongful use of both services and labor results in a single federal conviction). Section 666 does not use the "thing of value" language of section 641. Nonetheless, Congress seems to have intended section 666 to *expand* the ability of prosecutors to prosecute persons who were for technical reasons out of section 641's reach. Consequently, we find section 666's notion of "property" was intended to dovetail with the notion of property in section 641 and to be coextensive in its reach—Sanderson's theft of employee time is as much a theft of property as his theft of paint supplies, for the purposes of his section 666(a)(1)(A) conviction.

We address now whether Sanderson's conviction for the two forms of theft—whether jointly or singularly—satisfies traditional notions of fairness and due process. As Justice Holmes observed in *Roschen v. Ward*, 279 U.S. 337, 339, 49 S.Ct. 336, 336, 73 L.Ed. 722 (1929), "We agree to all the generalities about not supplying criminal laws with what they omit but there is no canon against using common sense in construing laws as saying what they obviously mean." In our common sense understanding of section 666, the theft of government property exemplifies an offense which can be committed by a variety of acts. *See Schad*, 111 S.Ct. at 2496–97 (actus reus for a crime can be proven in several different forms not specified by the statute); *Bouquett*, 820 F.2d at 169. It is not unfair to anticipate that, when one steals paint and supplies and then orders employees to use such materials in private contract work, both actions will be considered components of the larger, single fraudulent act of theft from the local government. Our understanding of this matter, which satisfies traditional notions of due process, is not in conflict with a plain language interpretation of section 666 or its legislative history in relation to section 641. Under a "plain error" review, the instruction was appropriate.

As a secondary matter, we note the indictment aggregated the value of the stolen employee time and the stolen painting supplies in reaching the statutory value of exceeding $5,000. Thus under section 666, where multiple conversions are part of a single scheme, it seems appropriate to aggregate the value of property stolen in order to reach the $5,000 minimum required for prosecution. Sanderson's utilization of the employees' services was part and parcel of his utilization of supplies from the Department. Both actions were part of a single scheme of theft of government supplies and services and the value of the labor and the materials for which Sanderson was found guilty of misappropriating was well over $5,000.

Sanderson's third argument on appeal stems from the district court's evidentiary ruling, that Sanderson could be impeached by use of evidence previously excluded from the direct case. At an earlier point in the trial, the United States attempted to introduce evidence that Sanderson had stolen air-conditioning and heating units; the district court rejected the introduction of this evidence, finding it violated Fed.R.Evid. 403 and was not truly within the purview of Fed.R.Evid. 404(b). Later, the court held that under Fed.R.Evid. 608(b), the government could interrogate Sanderson as to the stolen units, if Sanderson took the stand, because then the matter would bear on Sanderson's credibility.

In *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), the Court held that a defendant must testify in order to raise a claim of improper impeachment under Fed.R.Evid. 609. Rule 609 governs the admissibility of evidence of a prior conviction. Several circuits have construed *Luce* to apply to Rule 608(b) situations. *See United States v. Griffin*, 818 F.2d 97, 104–05 (1st Cir.1987); *United States v. Weichert*, 783 F.2d 23, 25 (2d Cir.1986); *United States v. Dimatteo*, 759 F.2d 831, 833 (11th Cir.1985). *Compare to United States v. Johnson*, 767 F.2d 1259, 1270 n. 9 (8th Cir.1985) (*Luce* analysis regarding Rule 609 applies with equal force to motions under Rule 404 because both

rules require the court to determine whether the danger of undue prejudice outweighs the probative value of the evidence). In keeping with this, we find an appeal of a Rule 608(b) ruling is precluded where the defendant did not testify at trial.

Affirmed.